## A07A2080. THOMAS v. THE STATE.
### (658 SE2d 796)

JOHNSON, Presiding Judge.

A jury found Darryl Thomas guilty of armed robbery and kidnapping with bodily injury, and not guilty of aggravated assault with intent to rape. The trial court directed a verdict of acquittal on a burglary charge. Thomas appeals from the judgment of conviction entered on the verdict, claiming the trial court erred in denying his motion for a directed verdict of acquittal on the armed robbery charge, failing to charge the jury on theft by taking as a lesser included offense of armed robbery, and denying his motion to suppress evidence seized from his home. None of the arguments has merit, so we affirm his convictions.

1. Thomas contends he was entitled to a directed verdict of acquittal on the armed robbery charge because he did not possess a weapon at the time he took the victim's money. Specifically, he points to the fact that he had lost control of his knife at the time he left the scene with the victim's money. This argument presents no ground for reversal.

The standard of review for the denial of a motion for a directed verdict of acquittal is the same as for determining the sufficiency of the evidence to support a conviction.[1] We view the evidence in a light most favorable to the jury's verdict, and the defendant no longer enjoys the presumption of innocence.[2] We do not weigh the evidence or determine witness credibility, but only determine if the evidence was sufficient for a rational trier of fact to find the defendant guilty of the charged offense beyond a reasonable doubt.[3]

Viewed in the light most favorable to the verdict, the evidence shows that Thomas rode his bicycle to a flower shop. The shop owner was outside when he arrived. In order to serve Thomas, the owner stepped inside the shop. Thomas followed the owner inside, pulled the door shut, shoved her against a wall, and put a knife to her face. Thomas grabbed the victim by her hair and forced her at knifepoint to the front door, telling her to lock the door. When the victim was unable to lock the door, Thomas punched her in the face. She grabbed her purse from nearby. Thomas snatched the purse from her and emptied it out. The purse contained about $30 cash. Thomas forced the victim to lie on the floor, and then began pulling off her clothing. He said that if she wanted to see her children again, she would do as he said. The victim fought with Thomas. He stabbed her in the hand

---

[1] *Hash v. State*, 248 Ga. App. 456, 457 (1) (546 SE2d 833) (2001).

[2] *Wesson v. State*, 279 Ga. App. 428, 429 (1) (631 SE2d 451) (2006).

[3] *Walker v. State*, 281 Ga. App. 163 (635 SE2d 422) (2006).

with his knife, and she stabbed him on the shoulder with a pair of garden shears she had grabbed from under the counter. The victim managed to get control of the knife, but Thomas gained possession of the shears and began stabbing the victim with those. He demanded the knife back and stabbed her on the legs in an effort to get the knife back. A customer walked in, and Thomas pushed the victim back onto the floor. He kicked and punched the victim as she lay on the floor. On his way out of the shop, Thomas took money from the victim's purse. He fled on an orange bicycle.

Under OCGA § 16-8-41 (a), a person commits the offense of armed robbery when, with intent to commit theft, he takes property of another from the person or the immediate presence of another by use of an offensive weapon. The force or intimidation essential to robbery must either *precede or be contemporaneous with*, and not subsequent to, the taking.[4] A relatively brief period of time between the use of the offensive weapon and the actual theft does not sever the connection between the two acts.[5]

As the evidence shows, Thomas held a knife to the victim and then took her purse. And, he used the knife again (as well as shears) against the victim just moments before taking money from her purse. The fact that the victim managed to get the knife out of his hand during the fight which occurred immediately before the second taking does not inure to Thomas' benefit. "Where, as here, the evidence is sufficient to authorize a finding that the theft was completed *after* force was employed against the victim, a conviction for armed robbery is authorized."[6] Thomas was not entitled to a directed verdict of acquittal on the armed robbery charge.[7]

2. Thomas contends the trial court erred in refusing to give a jury instruction on the lesser included offense of theft by taking. He says such a charge was warranted because the state did not establish that he took the victim's money from her immediate presence, since she was not holding the purse at the time he took the money from it. No theft charge was required here.

There was no evidence that Thomas committed theft by taking[8] rather than armed robbery. It is indisputable that Thomas used force in order to take possession of the victim's purse and money. Moreover,

---

[4] *Lowery v. State*, 209 Ga. App. 5, 6 (1) (432 SE2d 576) (1993); *Ramey v. State*, 206 Ga. App. 308 (425 SE2d 385) (1992); see also *Pope v. State*, 201 Ga. App. 537 (411 SE2d 557) (1991).

[5] *Lowery*, supra.

[6] *Wynn v. State*, 228 Ga. App. 124, 126 (1) (491 SE2d 149) (1997).

[7] See *Kemper v. State*, 251 Ga. App. 665, 666 (1) (555 SE2d 40) (2001).

[8] OCGA § 16-8-2 provides that a person commits the offense of theft by taking when he unlawfully takes or, being in lawful possession thereof, unlawfully appropriates any property of another with the intention of depriving him of the property.

the fact that the purse was not in the victim's hands during the second taking does not preclude an armed robbery conviction.[9] The evidence demonstrated completion of the greater offense, and no charge on theft by taking was required.[10]

3. Thomas contends the trial court erred in denying his motion to suppress evidence seized during a search of his home. He states that neither exigent circumstances nor valid consent justified the officer's initial warrantless entry of the residence. There was no error.

On appeal from a denial of a motion to suppress, we construe the evidence most favorably to uphold the trial court's factual findings and judgment.[11] If there is any evidence to support the trial court's findings on disputed facts and credibility, those findings will not be disturbed unless they are clearly erroneous.[12] When reviewing a trial court's ruling on a motion to suppress, this Court may consider trial testimony in addition to the testimony submitted during the hearing on the motion to suppress.[13]

The transcript shows that when Thomas fled from the flower shop on his bicycle, he was followed by two witnesses in separate vehicles. The witnesses described Thomas as wearing a gray sweatshirt with blood on the right shoulder and riding an orange bicycle. They followed him to a housing subdivision across the street from the floral shop and then lost sight of him.

In response to a 911 call, the police department broadcasted an alert to officers to report a stabbing at the flower shop. The broadcast described the assailant and his bicycle, and stated that a citizen in a car was following the suspect on his bicycle. The citizen was communicating the pursuit to the 911 dispatcher as it was unfolding, and the dispatcher was relaying the information to officers. Approximately five patrol cars converged on the area, with blue lights and sirens activated. The police cars circled the neighborhood, including a residential subdivision across the street from the flower shop, hoping to "set up a perimeter" in case the assailant was in the area.

One of the officers responding to the call saw one of the witnesses standing in front of a house in the subdivision. She said she had followed the suspect from the crime scene by car but lost sight of him.

---

[9] See *Welch v. State*, 235 Ga. 243, 245 (1) (219 SE2d 151) (1975) (one's "immediate presence" in this context stretches fairly far, including where victim has been driven away from robbery scene for 15 minutes while money was being taken, and robbery convictions are usually upheld even out of the physical presence of the victim if what was taken was under his control or his responsibility and if he was not too far distant).

[10] See *Jones v. State*, 246 Ga. App. 494, 496 (540 SE2d 693) (2000); *Rogers v. State*, 234 Ga. App. 507, 508 (1) (507 SE2d 25) (1998).

[11] *Postell v. State*, 279 Ga. App. 275, 276 (1) (630 SE2d 867) (2006).

[12] Id.

[13] Id.

When the officer asked her where Thomas was last seen, the witness pointed to two houses. The officer then saw three people leave a house located about one or two houses away from where the witness had pointed. One of the three people was Charles Sterling.

The officer approached Sterling, "the owner of the house." The officer asked Sterling if he had a son between 15 and 20 years old. Sterling said he had a 22-year-old stepson, and that his stepson had come home on his orange bicycle five to ten minutes earlier. The crime had occurred just five to ten minutes earlier. Sterling asked the officer, "what's he done now?"

The officer could see an orange bicycle in the open garage. He told Sterling they needed to "go in there and get" Thomas. Sterling replied "come on, let's go." The officer followed Sterling into the house. Sterling called out Thomas' name. Knowing the person he was looking for might still have a knife, the officer drew his gun. Thomas walked into the foyer. The officer noticed that Thomas' finger was bloody and had a rag wrapped around it. The officer placed Thomas on the ground and handcuffed him.

After placing Thomas in the patrol car, the officer asked Sterling about the sweatshirt described by the witnesses. Sterling told the officer that Thomas had just taken off his clothes and put them into the washing machine. The officer asked where the washer was. Sterling took the officer to the laundry room. The washer was running at the time. The officer looked inside and noticed that "all the clothes [Thomas] had were on — were in there." The officer was concerned that the evidence was being destroyed, and turned off the washing machine.

Police then applied for and obtained a warrant to search the residence. They also again obtained Sterling's consent. Inside the washer they found a sweatshirt with a cut and blood on the shoulder. On the premises they found a pair of Thomas' shoes with spattered blood on them, an orange bicycle, a bloody t-shirt, blue jeans with blood on them, and cash with what appeared to be blood on it. Thomas had fresh cuts on his shoulder and finger.

Thomas argues that the state failed to prove by probative evidence that Sterling's consent was valid, since there was no probative evidence that Sterling actually owned the home. He points out that the state produced no deed or proof of title at trial. He further urges that there was no probative evidence that Thomas was last seen near the residence, and no evidence that the officer was in hot pursuit when he entered the home.

(a) *Consent.* Permission to search may be obtained from one who possesses a common authority over or other sufficient relationship to

the premises sought to be inspected.[14] Common authority rests on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.[15] The voluntary consent of the head of a household to the search of premises owned or controlled by such head of the household is sufficient to authorize a search of the premises without a search warrant.[16]

Sterling testified at trial that the house was his. The washer, which was located in a laundry room next to the garage, was also his. Testimony that Sterling owned the home was uncontroverted. Sterling testified that he told the officer that Thomas was in the house, and that he gave the officer permission to go inside with him to find Thomas. The officer gave similar testimony at the hearing on the motion to suppress, which the trial court could properly admit at the suppression hearing even if it was hearsay.[17] Sterling clearly had authority to permit the officer to enter and search his house.[18] Thomas cites no authority to support his position that the state was required to present a deed or other evidence showing he actually owned the home. The evidence was sufficient to support the trial court's finding that a person with authority over the premises consented to the entry and search.

(b) *Exigent circumstances.* Furthermore, an exigent circumstance which justifies the warrantless entry of a home is the officer's reasonable belief that such action is a necessary response on his part to an emergency situation.[19] Exigent circumstances can be provided by hot pursuit.[20] Hot pursuit need not involve a high speed chase; the key is that the defendant is aware he is being pursued by the police and is therefore likely to disappear or destroy evidence of his wrongdoing if the officer takes the time to get a warrant.[21]

Here, police received word that a violent crime had just occurred moments earlier across the street from the subdivision where Sterling lived, that the suspect fled on a bicycle, that he had been seen

---

[14] *State v. West*, 237 Ga. App. 185 (514 SE2d 257) (1999).

[15] *Atkins v. State*, 173 Ga. App. 9, 10-11 (2) (325 SE2d 388) (1984).

[16] *West*, supra at 186.

[17] See *McDaniel v. State*, 263 Ga. App. 625, 627 (1) (588 SE2d 812) (2003).

[18] See generally *Howard v. State*, 207 Ga. App. 125, 126 (1) (427 SE2d 96) (1993).

[19] *Welchel v. State*, 255 Ga. App. 556, 559 (565 SE2d 870) (2002).

[20] *Anderson v. State*, 265 Ga. App. 428, 433 (4) (594 SE2d 669) (2004).

[21] Id.

near Sterling's house,[22] and that a person matching the suspect's description and riding an orange bicycle had just entered the house. Numerous police vehicles were circling the area, with lights and sirens activated, and one witness who was communicating with police followed the suspect from the crime scene into the area of his residence. The fact that some of the officer's testimony was based on hearsay does not make that testimony inadmissible for purposes of the suppression motion.[23] In light of the fact that the person being sought was suspected of having committed a violent felony nearby only a few minutes earlier, and measuring the police action from the foresight of a rapidly developing situation, there was evidence to support the court's finding of an exigent circumstance. The trial court did not err in denying the motion to suppress.

*Judgment affirmed. Phipps and Mikell, JJ., concur.*

DECIDED MARCH 4, 2008.

*Sexton, Key & Hendrix, Joseph S. Key,* for appellant.
*David McDade, District Attorney, James A. Dooley, Jeffrey L. Ballew, Marc A. Watkins, Assistant District Attorneys,* for appellee.

---

[22] At a suppression hearing, the conduct and motives of the officer are at issue, and the court must look to the information available to the officer, including hearsay, to determine if probable cause existed. *McDaniel,* supra at 627 (1). Thus, the trial court may admit hearsay testimony at the hearing, although it may not be admissible at trial. Id.

[23] See *McDaniel,* supra.